IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CAROL E. DODGE, | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 06-43 Erie |
| v. | ) |
| JO ANNE BARNHART,<br>Commissioner of Social Security, | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J., J.

Plaintiff, Carol E. Dodge, commenced the instant action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security denying her claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 *et seq*, and § 1381 *et seq.* Dodge filed applications for DIB and SSI on May 6, 2004, alleging disability since February 4, 2004 due to multiple sclerosis and a mood disorder (Administrative Record, hereinafter "AR", 94; 97-98; 258-263). Her applications were denied and she requested a hearing before an administrative law judge ("ALJ") (AR 35-38; 42; 265-269). A hearing was held before an administrative law judge ("ALJ") on August 9, 2005 (AR 275-321). Following this hearing, the ALJ found that Dodge was not entitled to a period of disability, DIB or SSI under the Act (AR 16-28). Her request for review by the Appeals Council was denied (AR 8-11), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision. Presently pending before the Court are cross-motions for summary judgment. For the reasons set forth below, we will grant Defendant's motion and deny Plaintiff's motion.

**I. BACKGROUND**

Dodge was born on November 22, 1954 and was fifty years old on the date of the ALJ's decision (AR 26). She is a high school graduate and completed three years of college, and

1

previously worked as a respiratory therapist (AR 99; 105).

On January 26, 2004, Dodge was seen by Kathleen Schaefer, M.D., a neurologist, and complained of tingling and numbness in her neck, trunk and hands (AR 159). An MRI of Dodge's brain conducted on January 30, 2004 was quite suggestive of multiple sclerosis, and on February 3, 2004, she was diagnosed with multiple sclerosis ("MS") (AR 137-138; 289-290). Dr. Schaefer prescribed Copaxon and Neurontin (AR 158).

When Dodge returned to Dr. Schaefer for follow-up on March 1, 2004, she reported that the tingling and sensation in her hands was better (AR 158). Physical examination revealed two point discrimination and sensation in her hands, mild weakness bilaterally and her gait was wide-based and mildly unsteady (AR 158). She exhibited full strength and her finger-to-nose testing was normal (AR 158). Dr. Schaefer assessed her with relapsing remitting MS and increased her Neurontin dosage (AR 158).

On March 29, 2004, Dodge reported significant fatigue by the afternoon (AR 157). Dr. Schaefer found that she had normal motility, gait, facial symmetry and strength in her lower extremities, but she exhibited mild 4+/5 weakness in her hands (AR 157). She had decreased sensation in her right hand up to the elbow and was paresthetic up to the elbow bilaterally (AR 157). Dr. Schaefer further found decreased light touch in digits 3, 4, and 5 of her right hand, decreased vibration and proprioception in the right hand, and abnormal finger-to-nose testing secondary to poor proprioception of the right hand (AR 157). Dr. Schaefer diagnosed relapsing remitting MS with fatigue and prescribed Amantadine (AR 158). Dr. Schaefer also limited her to working eight hours or less per day and no later than 7:00 p.m. at night, and imposed a ten pound lifting restriction primarily due to the poor proprioception in her hands (AR 158). It was noted that Dodge had not returned to work since her employer would not accommodate her restrictions (AR 158).

Dodge returned to Dr. Schaefer on May 24, 2004 and reported that she was working four hours per day as a respiratory therapist (AR 156). While her medication had helped with her fatigue, she claimed to suffer from extreme fatigue in the evenings (AR 156). On physical examination, she exhibited good strength in her upper extremities except for her deltoids, which were about 4, and her remaining examination remained unchanged (AR 156-157). Dr. Schaefer

again restricted her to working no more than eight hours per day with no evening hours (AR 157).

At the end of May 2004 Dodge suffered a sudden episode of head pain and fell (AR 155). An MRI of her head and neck revealed no change from the previous MRI (AR 167-168). On May 28, 2004, Dodge was seen by John Bellomo, D.O., her primary care physician (AR 130). She complained of headaches, generalized weakness on her right side, mood swings and anxiety (AR 130). Dr. Bellomo prescribed Klonipin and Xanax (AR 130).

When seen by Dr. Schaefer on June 2, 2004, Dr. Schaefer noted that her MRI did not show an acute event and was unchanged from her previous MRI (AR 156). Dodge reported that she continued to feel weaker after her fall (AR 156). Physical examination revealed mild bilateral upper extremity weakness and mild left lower extremity weakness (AR 156). Her gait was unremarkable, reflexes were symmetrically mildly brisk and there were no pathologic reflexes (AR 156). Dr. Schaefer determined that Dodge appeared weaker and more confused than in the past, and opined that she should not return to work for the next month (AR 156).

On July 13, 2004, Mary Hyozak, M.D., a state agency reviewing physician, assessed Dodge's residual functional capacity (AR 177-183). Dr. Hyozak opined that Dodge could occasionally lift twenty pounds; frequently lift ten pounds; stand and/or walk for a total of six hours in an 8-hour workday; sit for a total of six hours in an 8-hour workday; and was unlimited in her push/pull abilities (AR 177). She could only occasionally climb and balance, but could frequently stoop, kneel, crouch and crawl (AR 178). Dr. Hyozak also found Dodge was limited in the areas of fine manipulation and feeling but was unlimited in reaching and handling (AR 179). Finally, Dr. Hyozak opined that Dodge should avoid concentrated exposure of extreme cold, extreme heat and vibration (AR 180).

On July 21, 2004, Dr. Lanunziata, EdD., a state agency reviewing psychologist, completed a Psychiatric Review Technique form and concluded that Dodge's anxiety-related disorder was not severe (AR 184). Dr. Lanunziata further concluded that she was only mildly limited in her activities of daily living, had only mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace, and had no episodes of decompensation of extended duration (AR 194).

Dodge returned to Dr. Schaefer on August 20, 2004 complaining of increased left lower extremity weakness and neuropathic pain in her hands and feet (AR 225). She reportedly was unable to feel things with her hands and had burned herself cooking (AR 225). Physical examination revealed normal motility and facial symmetry (AR 225). Her upper extremity strength was about 4, right lower extremity strength was 4 and left lower extremity strength was 3+ with a component of give way (AR 225). She exhibited brisk reflexes in the upper and lower extremities, downgoing toes, absent vibration at the fingers and present vibration at the wrist (AR 225). Dr. Schaefer reported she had present vibration of the toes and midcalf level, there was dystaxia on finger-to-nose testing and her gait was antalgic (AR 225). She continued Dodge's medications, increased her Neurontin dosage and added a Prednisone taper to her medication regime (AR 226). Dr. Schaefer opined that "at this point" Dodge was permanently and totally disabled (AR 226).

Dr. Schaefer completed a Continuing Disability Claim form on September 29, 2004 and opined that Dodge was permanently disabled as of June 2, 2004 due to MS and that her prognosis for recovery was poor (AR 198).

Dodge returned to Dr. Bellomo on September 28, 2004 for follow-up (AR 223). She complained of balance problems and increased fatigue (AR 223). Dr. Bellomo increased her Neurontin dosage (AR 223).

On December 13, 2004, Dodge reported to Dr. Bellomo that the Lexapro had helped "a lot" (AR 222). She complained of agitation, difficulty remembering things from her old job and difficulty summarizing her thoughts (AR 222). While she reported the Ambien helped with her sleep, she noticed memory problems (AR 222). Dr. Bellomo diagnosed her mood disorder as improved due to the increased Lexapro dosage (AR 222). He referred her to a neuro-psychiatrist in order to evaluate whether her symptoms were related to her MS or her mood disorder (AR 222).

Dodge was evaluated by Horacio Fabrega, M.D., a psychiatrist, on December 20, 2004 upon referral by her primary care physician and upon recommendation of her lawyer (AR 227). She reported she was unable to work due to the results of her MS diagnosis, problems with her memory and difficulties in formulating thoughts and words (AR 227). She claimed she became

frustrated, discouraged, angry and was prone to lash out and throw things (AR 227). She admitted a history of anger proneness and lashing out, but felt her symptoms were more prominent since she had been diagnosed with MS (AR 227). Dodge reported that the Lexapro had decreased her frustration level and she had not lashed out as frequently (AR 227). She relayed a history of voluntary inpatient psychiatric treatment when she was 18 years old and described herself has a recovering alcoholic with 17 years of sobriety (AR 227). Dr. Fabrega reported that her predominate symptoms were anxiety, irritability and easy agitation (AR 227).

On mental status examination, Dr. Fabrega reported that Dodge was friendly, cooperative, walked with a cane, did not appear to be in acute distress and did not appear to be guarded or distrustful (AR 228). Her affect was positive, she was bright and pleasant, smiled frequently and did not show any resentment when discussing her medical problems (AR 228). However, Dr. Fabrega noted that on several occasions she became close to being irritable and angry when he asked questions seeking details (AR 228). He noted that Dodge had problems in formulating a word or at least recalling a word, clearly had difficulty in psychomotor processing and was slow to recall (AR 228). He found her insight was good, she was aware of her deficits and condition, was hard working, motivated and intelligent (AR 228).

Dr. Fabrega opined that since her diagnosis of MS, Dodge had experienced some slowing of her cognitive processes, increased irritability, increased anger expression and negative thinking, but she was a friendly and cooperative individual (AR 228). He noted that her seeking evaluation seemed to be predominantly for her legal and financial welfare related problems (AR 228). He diagnosed her with depression due to MS, and stated that her Global Assessment of Functioning (GAF) score had been as high as 95 over the past year, and at the time of the assessment was 65 (AR 229).[1]

---

[1] The GAF score considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. Scores between 100 and 91 indicate "[s]uperior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. No symptoms." *See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed. 2000). Scores between 61 and 70 indicate "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal

Dodge returned to Dr. Schaefer on December 22, 2004, who reported that Dodge was neurologically stable (AR 225). She had not had any major flares, Amantadine helped her fatigue and Neurontin helped her neuropathic pain (AR 225). Dodge reported that she was seeing a neuropsychiatrist for neuropsychological testing (AR 225). She claimed she had decreased short term memory and some difficulty with "word finding" (AR 225). On physical examination, Dr. Schaefer found her bilateral lower extremity strength was 3 to 3+ with some component of give way (AR 225). Finger-to-nose testing revealed dystaxia on the right greater than left, heel-to-shin was unremarkable, her gait was mildly wide based and ataxic and she exhibited decreased sensation up to the upper arms bilaterally (AR 225). Dodge was diagnosed with relapsing remitting MS, stable (AR 225). Dr. Schaefer continued her medications and indicated that she would consider adding Aricept to her medication regime if neuropsychological testing showed evidence of a deficit (AR 225).

Dodge was seen by Dr. Fabrega on January 24, 2005 and reported an improvement in her symptoms due to her medications (AR 254). She was less irritable, not as easily frustrated and had lost her temper less (AR 254). Dr. Fabrega reported that her affect was bright and cheerful, she was animated and exhibited good conversational flow except for an occasional loss of train of thought (AR 254). On mental status examination, he reported that she continued to exhibit cognitive slowing as evidenced by problems in immediate recall and executive functions (AR 254). He diagnosed her with mood disorder due to medical condition (AR 254).

On March 7, 2005, Dr. Fabrega reported that Dodge was severely compromised with MS motor, sensor, deficits and pain (AR 252). She walked slowly and with great difficulty, showed distress, had impaired recall of recent information and distractability and easily lost focus (AR 252). However, her affect was hopeful, animated and cheerful (AR 252). He assigned her a GAF score of 60 (AR 252).[2]

Dodge was referred to Tim Labuda, M.S., a specialty counselor, and Greg Slomka, Ph.D.,

---

relationships." *Id.*

[2] Scores between 51 and 60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

6

on March 18, 2005 for neuropsychological testing pursuant to the request of Dr. Fabrega (AR 231-233). They noted that while undergoing testing, Dodge's effort seemed less than optimal (AR 231). Therefore, a screening measure of purposeful effort was administered and the results indicated less than adequate effort (AR 231). Based upon formal test results, both examiners determined that Dodge was of average intelligence with commensurate verbal and nonverbal skills (AR 232). She also demonstrated adequate auditory attention, language skills, ability to learn and retain verbal information, and visuospatial/construction skills (AR 232). In terms of executive skills, Dodge demonstrated adequate functioning for both moderately complex and higher-level tasks (AR 232). She did demonstrate reduced immediate and delayed memory for visual information (AR 232). The examiner's considered favorable the absence of more significant cognitive impairment (AR 233). Continued treatment of her depression and close monitoring of her medical condition, cognition and daily functioning was recommended (AR 233).

When seen by Dr. Fabrega on May 23, 2005, he reported that Dodge's neuropsychological testing results were encouraging and he was unable to detect much organic deterioration (AR 248). He stated Dodge looked considerably more energetic, animated, exuded more confidence and less demoralization, and showed less fatigue (AR 248). Dr. Fabrega indicated that she was stable and her anxiety/depression symptoms were in better control (AR 248). He assigned her a GAF score of 60 (AR 248).

On June 27, 2005, Dr. Fabrega reported that Dodge's affect was bright, cheerful and energetic (AR 246). She did not ambulate slowly or appear dejected or weak and had no negative thoughts (AR 246). Dr. Fabrega found she was "definitely helped" by an increase in the Amantadine dosage (AR 246). Major stressors were reviewed involving her son and his girlfriend, and the fact that Dodge was caring for her daughter's twins (AR 246).

On July 5, 2005, an MRI of Dodge's brain revealed findings similar to the MRI conducted on May 28, 2004 (AR 236). The findings were reported as essentially unchanged (AR 236).

On July 6, 2005, Dr. Schaefer completed a second Continuing Disability Claim form and opined that Dodge was permanently disabled due to MS and would not recover (AR 235).

Finally, on August 15, 2005, Dr. Schaefer completed a Residual Functional Capacity Questionnaire describing Dodge's symptomatology and stating she was not a malingerer (AR 240). Dr. Schaefer reported that Dodge continued to have significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of movement, gait or station, and had significant reproducible fatigue of motor function with substantial muscle weakness on repetitive activity (AR 240-241). Dr. Schaefer opined that Dodge's impairment produced "good days" and "bad days" and that she was unable to work (AR 243-244). She concluded Dodge could only sit, stand and walk for less than two hours in an 8-hour workday, must use an assistive device in standing and walking, and could never lift or carry any weight (AR 242-243).

Dodge and Irene Montgomery, a vocational expert, testified at the hearing held by the ALJ. Dodge testified that she suffered from MS, depression and neuropathy in her arms and hands (AR 295; 298). She claimed her memory problems and left-sided weakness had worsened since February 2004 (AR 298-299). She also suffered from weakness and muscle spasms but did not know whether it was due to her disease or medication side effects (AR 300). Dodge testified she was able to bath and dress herself; prepare simple meals; drive approximately 60 miles per week; load the dishwasher; place pieces of laundry in the washing machine; watch television; and play computer games, but did not perform housework, grocery shop or take out the trash (AR 300-304). Dodge further testified that she ate out approximately five nights per week since she did not cook and visited with friends approximately four times per month (AR 305-306).

Dodge testified that she participated in hydrotherapy mobility exercises and used a cane which was prescribed by Dr. Bellomo (AR 301). In addition to the cane, she used a walker, wheelchair and/or scooter as needed during flair ups (AR 307-308). She was unable to use buttons or tie shoes (AR 308). Although she was able to read the Bible and the newspaper, she claimed she had to read it three or four times in order to understand a sentence (AR 304; 310). Dodge testified that she fell at least once a day and suffered from incontinence (AR 310-311).

The ALJ asked the vocational expert to assume an individual of Dodge's age and past work experience, who was a younger individual, but was closely approaching the advanced age category (AR 314). The ALJ further asked the vocational expert to assume that this individual

would be limited to a maximum of light exertional work, and would have the following additional restrictions: (1) the individual could not walk or stand more than a total of four hours in any given day; (2) the individual could not use ropes, ladders and scaffolds, but could occasionally use ramps and stairs; (3) the individual could not kneel or crawl but could occasionally crouch; (4) sedentary occupations must be compatible with a sit/stand and walk option; (5) the individual would be prohibited from occupations requiring fingering or feeling; (6) the individual could only occasionally push and pull; and (7) the individual would have to avoid even moderate exposure to temperature extremes, extreme weather conditions, dangerous machinery and unprotected heights (AR 314-315). The vocational expert testified that such an individual could perform work as a cashier, toll collector, inside mall booth attendant, inserter, order clerk, address or mail sorter and table worker (AR 316-318).

Following the hearing, the ALJ issued a written decision finding that Dodge was not entitled to a period of disability, DIB or SSI within the meaning of the Social Security Act (AR 16-28). Her request for review by the Appeals Council was denied making the ALJ's decision the final decision of the Commissioner. She subsequently filed this civil action.

## II. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see Richardson v. Parales,* 402 U.S. 389, 401 (1971). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995).

## III. DISCUSSION

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). Title XVI of the Act establishes that SSI benefits are payable to those individuals who are similarly

disabled and whose income and resources fall below designated levels. 42 U.S.C. § 1382(a). A person who does not have insured status under Title II may nevertheless receive benefits under Title XVI. *Compare* 42 U.S.C. § 423(a)(1) *with* 42 U.S.C. § 1382(a). In order to be entitled to DIB under Title II, a claimant must additionally establish that his disability existed before the expiration of his insured status. 42 U.S.C. § 423(a), (c). The ALJ found that Dodge met the disability insured status requirements of the Act (AR 18). SSI does not have an insured status requirement.

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition:

> In the first two steps, the claimant must establish (1) that he is not engaged in "substantial gainful activity" and (2) that he suffers from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). If the claimant shows a severe medical impairment, the [Commissioner] determines (3) whether the impairment is equivalent to an impairment listed by the [Commissioner] as creating a presumption of disability. *Bowen*, 482 U.S. at 141. If it is not, the claimant bears the burden of showing (4) that the impairment prevents him from performing the work that he has performed in the past. *Id.* If the claimant satisfies this burden, the [Commissioner] must grant the claimant benefits unless the [Commissioner] can demonstrate (5) that there are jobs in the national economy that the claimant can perform. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

*Jesurum*, 48 F.3d at 117.

The ALJ resolved Dodge's case at the fifth step. At step two, the ALJ determined that her MS was a severe impairment, but determined at step three that she did not meet a listing (AR 18-22). At step four, the ALJ determined that she could not return to her past work, but retained the residual functional capacity to perform work at the light and/or sedentary exertional level with limitations (AR 22). At the final step, the ALJ determined that Dodge could perform the jobs cited by the vocational expert at the administrative hearing (AR 26-27). The ALJ

additionally found that Dodge's subjective complaints were inconsistent with the totality of the evidence (AR 23).  Again, we must affirm this determination unless it is not supported by substantial evidence.  *See* 42 U.S.C. § 405(g).

Dodge first challenges the ALJ's finding that she has only mild limitations in daily activities, social functioning and in maintaining concentration, persistence or pace.  In essence, Dodge appears to argue that her alleged mental impairment medically met or equaled a Listing.  Since Dodge has not directed us to any particular Listing in support of her argument, we shall look to the Listing considered by the ALJ, namely, Listing 12.04, Affective Disorders.  This Listing consists of paragraph A criteria (a set of medical findings), paragraph B criteria (a set of impairment-related functional limitations) and paragraph C criteria (a set of additional functional limitations).  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(A).  The required level of severity for 12.04 affective disorders is met when "the requirements in both A and B are satisfied, or when the requirements in C are satisfied."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04.

Here, the ALJ recognized that Dodge had been diagnosed with anxiety and a mood disorder, but that she failed to meet the B criteria (AR 19-20).  The paragraph B requirements of Listing 12.04 require at least two of the following:

> 1. Marked restriction of activities of daily living; or
>
> 2. Marked difficulties in maintaining social functioning; or
>
> 3. Marked difficulties in maintaining concentration, persistence or pace; or
>
> 4. Repeated episodes of decompensation, each of extended duration[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04(B), 12.06(B).  The term "marked" means "more than moderate but less than extreme," and a "marked limitation" is one that seriously interferes with a claimant's ability to "function independently, appropriately, effectively, and on a sustained basis."  20 C.F.R. Pt. 404, Subpt. P, Appx. 1 § 12.00C.

We note that the ALJ determined at step two that Dodge's alleged mental impairments

were not severe (AR 21). Nonetheless, he concluded that her mental impairment did not meet the part B criteria because the evidence reflected only mild limitations with respect to her activities of daily living, social functioning and concentration, persistence or pace, and there was no evidence of episodes of decompensation of an extended duration (AR 19-21). All of these findings are supported by substantial evidence. As noted by the ALJ, Dodge reported that her husband and family pets depended on her for care (AR 107). She was able to bath and dress herself, prepare simple meals, drive approximately 60 miles per week, load the dishwasher, place pieces of laundry in the washing machine, watch television, play computer games and care for her daughter's twins (AR 246; 300-304).

Regarding Dodge's ability to maintain social functioning, the ALJ observed that she reported she had no problems getting along with friends, family, people in authority and was able to respond to criticism (AR 111). Moreover, we observe that Dodge herself did not testify to any deficiencies in this area, and stated that she visited with friends approximately four times per month (AR 306). In addition, Dr. Bellomo reported that Dodge's mood had improved in December 2004, and Dr. Fabrega, her treating psychiatrist, reported her affect was positive and she was bright and cheerful (AR 228). While Dr. Fabrega did note some increased irritability, he found her nonetheless friendly and cooperative (AR 228). By January 2005, Dr. Fabrega reported an improvement in her symptoms with decreased irritability and that she was bright, cheerful and animated (AR 254). The ALJ's findings that Dodge suffered only mild limitations in social functioning is therefore supported by the record.

Finally, substantial evidence supports the ALJ's determination that Dodge suffered only mild difficulty in maintaining concentration, persistence or pace. When initially evaluated by Dr. Fabrega in December 2004, he noted some slowing of her cognitive processes, but assigned her a GAF score of 65 at the time of the assessment, which indicates only mild symptoms. *See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed. 2000). In March 2005, Dr. Fabrega noted Dodge experienced distractability and easily lost focus, but found her

symptoms were only moderate as reflected in her GAF score of 60 (AR 252). *Id*. When evaluated by Greg Slomka, a psychologist, and Tim Labuda, a specialty counselor, both determined that Dodge was of average intelligence with commensurate verbal and nonverbal skills (AR 232). She demonstrated adequate auditory attention, language skills, ability to learn and retain verbal information, and visuospatial/construction skills (AR 232). While Dodge demonstrated some reduced immediate and delayed memory for visual information, she had adequate function for both moderately complex and higher-level tasks (AR 232). Finally, Dr. Fabrega reported in May 2005 that Dodge's condition was stable and her symptoms were in better control, and noted June 2005 that she was bright, cheerful and energetic, and had definitely been helped by an increase in her medication dosage (AR 246; 248). We therefore find no error in the ALJ's conclusion that Dodge failed to meet Listing 12.04 due to her mental impairments.

Dodge further challenges the ALJ's finding that she can perform light work with certain restrictions. She contends that this finding is contrary to her treating physician's opinions and her testimony. It is undisputed that Dodge suffers from MS, and the ALJ specifically found that the medical evidence demonstrated this impairment was severe (AR 18). However, disability is determined not by the mere presence of impairments, but rather by the functional restrictions placed on an individual by those impairments. *See Jones v. Sullivan*, 954 F.2d 125, 129 (3rd Cir. 1991). Thus, the critical issue is the extent of Dodge's residual functional capacity.

"'Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3rd Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3rd Cir. 1999); *see also* 20 C.F.R. § 404.1545(a). An individual claimant's RFC is an administrative determination expressly reserved to the Commissioner. 20 C.F.R. § 416.927(e)(2). In making this determination, the ALJ must consider all evidence before him. *Burnett*, 220 F.3d at 121.

In fashioning Dodge's RFC, the ALJ reviewed the medical evidence of record, Dodge's testimony and subjective complaints and concluded that she was not precluded from all types of

13

work activities (AR 22-25). Dodge claims the ALJ failed to accord proper weight to the opinion of Dr. Schaefer, her treating physician. It is well settled in this Circuit that the opinion of a treating physician is entitled to great weight and can only be rejected on the basis of contrary medical evidence. *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3rd Cir. 1988). Where an ALJ chooses to reject the opinion of a treating physician, he must adequately explain in the record his reasons for doing so. *Sykes v. Apfel,* 228 F.3d 259, 266 (3rd Cir. 2000) ("Where the Secretary is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence.").

We find that the ALJ considered Dr. Schaefer's opinions consistent with the above standards. Dr. Schaefer initially opined in March 2004 and May 2004 that Dodge could work an eight hour day with no evening hours and imposed a ten pound lifting restriction (AR 157-158). Less than ten days later however, in June 2004, she opined that Dodge should not return to work for the next month (AR 156). A treatment note entry in August 2004 noted that "at this point" Dodge was totally and permanently disabled (AR 226). Dr. Schaefer subsequently completed a form in September 2004 and July 2005 opining that Dodge was permanently disabled as of June 2004 due to MS (AR 198; 235). Finally, Dr. Schaefer assessed Dodge's RFC in August 2005 and concluded that she could only sit, stand and walk for less than two hours in an 8-hour workday, must use an assistive device in standing and walking, and was precluded from lifting or carrying any weight (AR 242-243).

The ALJ declined to accord controlling weight to her later opinions, in part, since they were on an issue reserved to the Commissioner (AR 25). We find no error in this regard. "The ultimate decision concerning the disability of a claimant is reserved for the Commissioner." *Knepp v. Apfel,* 204 F.3d 78, 85 (3rd Cir. 2000). The pertinent regulations provide that opinions on some issues, including the opinion of whether a claimant meets the statutory definition of disability (i.e., is "disabled" or "unable to work") are not medical opinions "but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that

are dispositive of a case. ..." 20 C.F.R. §§ 404.1527(e); 416.927(e).

The ALJ further rejected Dr. Schaefer's later opinions on the basis that they were inconsistent with her earlier opinions, the clinical and objective findings, Dodge's treatment history and her activities of daily living (AR 25). A treating source's medical opinion concerning the nature and severity of the claimant's alleged impairments will be given controlling weight if the Commissioner finds that the treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2). Here, we conclude that the ALJ properly declined to give Dr. Schaefer's opinions controlling weight under these standards.

As noted by the ALJ, Dr. Schaefer's opinions of disability were inconsistent with her prior opinions relative to Dodge's functional capacity and the clinical and objective findings. Dodge's physical examinations in June 2004 and August 2004, when Dr. Schaefer first opined that she was disabled, were essentially unchanged from her May 2004 examination, wherein Dr. Schaefer opined she was able to work (AR 156; 225-226). Likewise, as further noted by the ALJ, the treatment notes reflect that Dodge had not experienced any flares following June 2004 and her MRI's show that her MS has been stable since 2004 (AR 25). An MRI conducted in June 2004 MRI showed no acute event and was unchanged from her previous MRI (AR 156). Dr. Schaefer reported in December 2004 that Dodge was neurologically stable, had not had any major flares and medications had helped with her fatigue and pain (AR 225). Finally, a July 2005 MRI of Dodge's brain was reported as essentially unchanged from the MRI conducted in May 2004 (AR 236).

The ALJ further rejected Dr. Schaefer's opinions based, in part, on his finding that Dodge's treatment history was inconsistent with an individual experiencing totally debilitating symptomatology (AR 24-25). He noted that beginning in January 2004, Dodge was treated by a neurologist every one to two months through August 2004 but had no subsequent follow-up

15

appointments until December 2004 and June 2005 (AR 24). Dodge takes issue with the ALJ's statement that the evidence did not reveal that she participated in physical therapy (AR 24). Dodge claimed to have attended physical therapy through Keystone Rehabilitation (AR 116), and Dr. Schaefer's treatment note dated August 20, 2004 references exercise therapy at the YMCA (AR 226). Other than these brief references, the record is devoid of any other evidence documenting physical therapy treatment. In any event, even assuming that the ALJ erred in this regard, it is harmless in light of the other evidence of record supporting the ALJ's additional reasons for rejecting Dr. Schaefer's later opinions that Dodge was disabled.

Dodge further challenges the ALJ's reliance on her daily activities in rejecting Dr. Schaefer's opinions. As the ALJ noted in his decision, he thoroughly examined Dodge's daily activities in connection with his evaluation of the paragraph B criteria relative to her alleged mental impairment (AR 23). He concluded that her daily activities were inconsistent with an individual who was unable to perform any substantial gainful activity (AR 24). The ALJ's evaluation was completely consistent with the requirement that in determining a claimant's RFC, an ALJ must consider "all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of the evidence." *SSR* 96-5p (1996), 1996 WL 374183 *5. We find no error in the ALJ's rejection of Dr. Schaefer's later opinions as the ALJ's conclusion that they were "inconsistent with other substantial evidence" is amply supported by the record.

Finally, Dodge challenges the ALJ's credibility determination. She claims that the ALJ improperly discredited her subjective complaints of falling, pain, need for rest breaks, problems with her with her hands and going to the bathroom, problems with sitting, standing and walking, and her memory problems. An ALJ must consider subjective complaints by the claimant and evaluate the extent to which those complaints are supported or contradicted by the objective

medical evidence and other evidence in the record. 20 C.F.R. §§ 404.1529(a); 416.929(a). Subjective complaints must be seriously considered, whether or not they are fully confirmed by the objective medical evidence. *See Smith v. Califano*, 637 F.2d 968 (3rd Cir. 1981). The ALJ as the finder of fact can reject, partially or fully, subjective complaints if he finds them not credible based on other evidence in the record. *Baerga v. Richardson,* 500 F.2d 309, 312 (3rd Cir. 1974). The ALJ is empowered to evaluate the credibility of witnesses and his determination is entitled to deference by this Court. *See Van Horn v. Schweiker*, 717 F2d 871, 873 (3rd Cir. 1983). In his assessment of Dodge's credibility, the ALJ found that her subjective complaints were inconsistent with the totality of the evidence (AR 23).

We find no error in the ALJ's credibility assessment. Contrary to Dodge's argument, the ALJ gave numerous reasons in support of his credibility determination consistent with the above standard. The ALJ noted that the clinical and objective findings, her activities of daily living and her treatment history (all discussed previously) were inconsistent with an individual experiencing debilitating symptomatology (AR 23-24). He also observed that her treatment records demonstrated that medication had helped her symptoms and the records contained no references to complaints of significant or debilitating side effects as reported by Dodge (AR 24). Finally, the ALJ observed that Dodge discontinued working due to her employer's failure to allow her to work rather than an inability to work (AR 25). All of these findings are substantiated by the record, and the ALJ was not required to accept Dodge's assertions that her impairments were completely debilitating. We therefore find that there was substantial evidence in the record, taken as a whole, to support the ALJ's credibility determination.

### IV. CONCLUSION

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CAROL E. DODGE, | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 06-43 Erie |
| v. | ) |
| JO ANNE BARNHART,<br>Commissioner of Social Security, | ) |
| Defendant. | ) |

## **ORDER**

AND NOW, this 30th day of January, 2007, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [Doc. No. 7] is DENIED, and the Defendant's Motion for Summary Judgment [Doc. No. 9] is GRANTED. JUDGMENT is hereby entered in favor of Defendant, Jo Anne B. Barnhart, Commissioner of Social Security, and against Plaintiff, Carol E. Dodge. The clerk is directed to mark the case closed.

s/ Sean J. McLaughlin<br>
United States District Judge

cm: All parties of record.